ROSE BENJAMIN, complainant-appellant,

*v.*

KOPPEL BENJAMIN, also known as Edward O. Benjamin, defendant-respondent.

[Argued May 19th, 1932. Decided October 17th, 1932.]

*Mr. Otto A. Stiefel,* for the appellant.

*Messrs. Kalisch & Kalisch (Mr. Samuel Kalisch, Jr.,* on the brief), for the respondent.

The opinion of the court was delivered by

TRENCHARD, J.

Rose Benjamin filed a bill for separate maintenance. Her husband answered and counter-claimed, charging that his wife had committed adultery with one Boldridge on December 16th, 1930, at 56 Runyon street in the city of Newark.

The vice-chancellor advised a decree dismissing the bill for maintenance, and granting the husband a divorce on the ground of adultery. The wife appeals.

A careful examination of the evidence satisfies us that the following facts are established: The parties were married in 1912 and have lived in Newark since 1914. The husband was a chemist and engineer. They had two children aged thirteen and eighteen years, respectively. In the year 1928 the wife formed the acquaintance of Boldridge, her alleged paramour, and thereafter that acquaintance grew into intimacy. In 1929 the wife began neglecting her household and remaining out late at night, and on one occasion all night

without explanation. It soon came to the knowledge of her husband that she was consorting with Boldridge, meeting him clandestinely. The husband complained to his wife of her conduct and the wife said that she "had not been living while the children were young and now they were older she was going to have a good time." Quarrels ensued between the husband and wife, and culminated in the husband's forbidding his wife to consort with Boldridge and telling her to keep away from him. The husband also told Boldridge to keep away from his wife. He told his wife that the neighbors were talking about her, and his wife said that it was only gossip and that she "would go with him anyway." He told her that he "would not stand for that sort of stuff," and she replied: "Well, go away for two years and then you don't have to stand for it." By that time the wife had lost all affection for her husband and had become completely enamored with Boldridge and he with her. The husband became so aggravated and agitated over her conduct that his health became affected and he was compelled to get medical advice; and about the last of the year 1929, after learning that his wife, disregarding his protests, persisted in her course, he left his home and went to live at a hotel in Newark. The wife remained in the house which her husband had bought and given to the wife in 1924, and the husband continued to supply money for the household. Thereafter the wife loaned to Boldridge $500, which loan they agreed to keep secret, and which was never repaid. Boldridge gave Mrs. Benjamin a book to read in which he had underscored obscene passages. The wife was seen frequently in the company of Boldridge by the latter's wife and by others, sometimes meeting him in the park and riding with him alone late at night in his automobile, sometimes frequenting restaurants with him, and on one occasion they were followed by Boldridge's wife, who assaulted Mrs. Benjamin; and on another occasion they were followed by Mr. Benjamin and some of his friends and were found together in an automobile. One result of this intimacy between Mrs. Benjamin and Boldridge was that the latter left his home and went to live

under a fictitious name in an apartment kept by a woman at 56 Runyon street, Newark, which the witnesses described as of a disorderly character. The woman who kept this house had been divorced by her husband and the custody of her children had been awarded to her husband by the court of chancery. Mrs. Benjamin frequently met Boldridge at that apartment, always in the night-time, remaining until midnight, and on departing on one occasion showed evidence of intoxication, and was heard to say, "wow, what a time I had!" On one or more of these visits the wife was seen hugging and kissing Boldridge. The husband, learning of these visits, went to this apartment about midnight on December 16th, 1930, accompanied by an investigator, a constable, and several of his personal friends. When they knocked at the door demanding admission they were told by the woman proprietor of the apartment that they could not come in immediately as she was not dressed, and they were obliged to wait ten minutes. Then they entered and they found Mrs. Benjamin in the kitchen, pulling down her dress and pulling up her stockings and arranging her hair. Upon asking her if Boldridge was in the apartment, she denied it. Turning to the bedroom the party found Boldridge in bed in his pajamas.

Such recited matters of fact were established by the testimony produced by the husband, and as to most of the essential facts, they were either admitted or uncontradicted by the wife and Boldridge at the hearing, although they both stoutly denied adultery.

The appellant says that this evidence was not conclusive evidence of guilt. We think it was.

It seems to be argued that direct proof of adultery was essential. If that were the rule, but few cases of manifest guilt could be established, for adultery is almost invariably clandestine, and is committed only when precaution is taken to preclude discovery.

Direct proof of adultery is not required; but to establish it by inference the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the

conclusion of guilt. *Berckmans* v. *Berckmans, 16 N. J. Eq. 122; affirmed, 17 N. J. Eq. 453.*

To prove adultery by circumstances, a criminal desire and an opportunity to gratify it need only be shown. Where both these concur, guilt is presumed. *Black* v. *Black, 30 N. J. Eq. 228.* This is known as the "inclination and opportunity" rule. We think that both were amply shown.

The appellant contends that the proofs show "mere imprudence, indiscretion or folly" and not a criminal desire. But we think they show the latter. Proof, as here, that the wife neglected her home and remained away nights without explanation; that she had lost all affection for her husband and bestowed it on her alleged paramour; that the wife and her alleged paramour sought and had stolen interviews; that there passed between them obscene literature; that they were indecently familiar and were found in compromising situations, amply justifies, and in this case requires, the inference of a criminal desire to commit adultery. Since there was ample proof of opportunity, the proof of adultery was complete.

In this connection it is argued that "no inference unfavorable to the wife should be drawn from the exhibits admitted in the court below." We are unable to take that view. An inference of adulterous desire which is necessary to inferential proof of guilt may be drawn from the exchange of obscene literature between the wife and the alleged paramour under conditions, as here, showing a condition of mind favorable to the commission of adultery. *Letts* v. *Letts, 79 N. J. Eq. 630; Stickle* v. *Stickle, 48 N. J. Eq. 336.*

The appellant says that the decree should be reversed because the ground stated by the vice-chancellor in his opinion is insufficient to sustain the decree advised by him. This point is ill-founded in law. The duty of this court on appeal from the court of chancery is to inquire whether there is any error in the decree appealed from, not whether the reasons given for the conclusion reached below are tenable. Of course this court avails itself of the light that may be furnished by the reasoning of the opinion of the court below filed pursuant

to the requirement of our state constitution, article 6, section 2, paragraph 5. *Shauinger* v. *Apter, 96 N. J. Eq. 302.*

Lastly it is argued that the husband should be denied a divorce because he, in some manner, acquiesced or connived in her offense.

But this contention is plainly ill-founded in point of fact. Of course we recognize that there is imposed upon the husband the duty to protect his wife, and if he sees acts or conduct on her part which a reasonable man could not see without being convinced that his wife's honor is being placed in jeopardy, he is called upon to exercise peculiar vigilance in the care of his wife; and if he makes no effort to avert the natural consequences of his wife's conduct, he will be assumed to have contemplated and acquiesced in the result of such conduct. But that is not this case—far from it—and so the rule has no application here.

Where, as here, the husband has in no way been responsible for the wife's adultery, he is not guilty of connivance. A husband may properly watch his wife, whom he suspects of adultery, in order to obtain proof of the fact, and such conduct does not constitute connivance or consent on his part, in the absence of evidence of encouragement on the part of the husband. In this case there was no evidence of connivance or encouragement—not even the slightest. *Inderlied* v. *Bullen, 80 N. J. Law 7; Lehman* v. *Lehman, 78 N. J. Eq. 316; Brown* v. *Brown, 62 N. J. Eq. 29.* In this connection the appellant calls attention to the fact that the husband desired to be rid of his wife and sought a divorce. It is true that for almost a year before the act of adultery complained of and proved in this proceeding, the husband did desire to get rid of his wife by divorce, by reason of suspicion of her infidelity. But a husband's desire to be rid of his wife by way of divorce, by reason of suspicion of her infidelity, even though he allows her to pursue her own course after repeated warnings, is not such connivance as prevents him from securing a divorce upon proof of adultery thereafter committed by her. *Dilatush* v. *Dilatush, 86 N. J. Eq. 316; Wille* v. *Wille, 88 N. J. Eq. 581.*

The foregoing observations in effect dispose of every question raised and argued.

The decree below will be affirmed.

*For affirmance*—The Chancellor, Trenchard, Parker, Lloyd, Case, Bodine, Donges, Brogan, Van Buskirk, Kays, Dear, Wells, Kerney, JJ. 13.

*For reversal*—None.